IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MISTY K.,**

        **Plaintiff,**

   v.                                              Civil Action 2:21-cv-548
                                                        Judge James L. Graham
                                                        Magistrate Judge Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Misty K., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.**      **BACKGROUND**

Plaintiff protectively filed her applications for DIB and SSI on April 23, 2018, asserting disability beginning on June 26, 2017. (Tr. 215–16, 217–26). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on March 4, 2020, before issuing a decision denying Plaintiff's applications on May 15, 2020. (Tr. 9–29, 30–70). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final for purposes of judicial review. (Tr. 1–6).

Next, Plaintiff brought this action (Doc. 1). As required, the Commissioner filed the administrative record, and the matter has been fully briefed. (Docs. 12, 13, 14, 19).

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's testimony as follows:

[Plaintiff] premised her claim for disability on stroke and blindness (3E/2). At the hearing, [Plaintiff] testified that she is unable to work due to her vision impairments and anxiety. As far as her vision symptoms, [Plaintiff] testified that she has eye pain, double vision, floaters and blurry vision. She initially reported that she has no depth perception or peripheral vision, but later indicated that she does have some peripheral vision in her left eye. [Plaintiff] testified that she has frequent headaches and dizziness.

[Plaintiff] said that she was prescribed prism stickers to wear on her glasses, but she does not use the stickers because it makes her feel sick. She said that she also has a prescription for a walking cane. [Plaintiff] testified that she bumps into walls and objects and falls down "a couple times" during a typical week. As far as her mental symptoms, [Plaintiff] testified that she has significant anxiety, especially at night. She reported that she has received counseling and takes medications for her symptoms. [Plaintiff] testified that she lives alone. She said that she is unable to wash dishes, cut up food or fill a glass due to her vision impairment. However, she said that that she often sweeps the floor and works in her yard. She said that she often rearranges her furniture because she has tunnel vision and wants to feel like she has more room in her living room.

(Tr. 18).

### B. Relevant Medical History

The ALJ summarized Plaintiff's medical records related to her vision impairment:

In June 2017, [Plaintiff] was admitted to the hospital for intracranial hemorrhage and multiple embolic strokes (13F/8). She subsequently developed vision problems, including left eye retinal detachment with multiple breaks, which required numerous eye surgeries. For example, [Plaintiff] underwent left eye vitrectomy for retinal attachment in August 2017 (14F/132, 182). In October 2017, she underwent vitrectomy and retinectomy for persistent retinal detachment of the left eye (2F/21).

In July 2018, [Plaintiff] had phacoemulsification with posterior chamber intraocular lens placement of the left eye (14F/59). In October 2018, [Plaintiff] underwent a YAG capsulotomy on the left eye for treatment of posterior capsular opacification (14F/41).

In August 2018, [Plaintiff] had an internal medicine consultative examination with Jameson Mattingly, M.D., at the request of the State agency (*see generally* 3F). Upon physical examination, [Plaintiff] walked with a normal gait without an assistive device and straight leg raise testing was negative bilaterally. She

demonstrated 5/5 strength in the upper and lower extremities (3F/6). [Plaintiff] had 5/5 gross grip strength, normal fine fingering and reported no issues with picking up a coin, a key, writing, holding a cup, opening a jar, buttoning or unbuttoning, using a zipper or opening a door (3F/7). [Plaintiff] also demonstrated normal range of motion in her cervical spine, shoulder, elbow, wrist, hands, fingers, dorsolumbar spine, hip, knee, and ankle. Dr. Mattingly assessed that [Plaintiff's] visual acuity was "greater than 2200" bilaterally without correction, but concluded the extent of [Plaintiff's] vision was unclear (3F/6).

Progress notes from the OSU Havener Eye Institute document [Plaintiff's] reports of spots and/or floaters in the left eye, flashes of light and trouble with depth perception and double vision (6F/36; 10F/1; 14F/8-9, 43). On examination, in August 2018, [Plaintiff's] distance visual acuity without correction was 20/70+1 on the right and 20/300 on the left (14F/44).

In October 2018, [Plaintiff] underwent a consultative ophthalmology examination by Jon Cooperrider II, O.D. (*see generally* 7F). Dr. Cooperrider determined that [Plaintiff's] visual acuity for distance and reading was hand movements at 16 inches with best correction (7F/1). Dr. Cooperrider also determined that [Plaintiff's] visual fields were abnormal, although it was indicated that the visual field testing had "low test reliability" (7F/6).

In May 2019, [Plaintiff] underwent a neuro ophthalmic evaluation with Dr. Chrisoula Morris, O.D., for a glasses prescription (14F/8-9). It was noted that [Plaintiff] used to wear glasses with a prism in them, but that her regular optometrist never got it correct so she did not wear any prescription glasses. [Plaintiff's] distance visual acuity without correction was 20/40 on the right and 20/200 on the left (14F/11). Based upon the results of the examination, [Plaintiff] was prescribed an updated glasses prescription with a prism (14F/11). It was noted that [Plaintiff] achieved single vision based upon the prescription combination that was demonstrated to her in the phoropter during the examination (14F/12).

In August 2019, [Plaintiff] followed up with Dr. Michael Wells, M.D., for reports of eye flashes and floaters (14F/3). [Plaintiff] reported that she did not like the new glasses she received after seeing Dr. Morris (14F/6). She indicated that her overall vision was unchanged but that it was "much better when she is using her drops" (14F/3). She complained of left eye pain and headaches. Her distance visual acuity without correction was 20/60-2 on the right and 20/400 on the left (14F/3). Optical coherence tomography (OCT) imaging indicated that [Plaintiff] had persistent central subretinal fluid in the right eye but it may be slightly improved. It was noted that [Plaintiff] had a clearer view posteriorly since she underwent surgeries in July 2018 and November 2018 (14F/5). Ocular hypertension was also found to be under good control on Combigan medication. In terms of [Plaintiff's] history of retinal detachment, it was noted that her retina was mostly attached, although there was a small area of subretinal fluid. Finally, [Plaintiff's] subretinal/choroidal abscesses infection was resolved.

3

(Tr. 18–20).

### C. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirement through September 30, 2018, and Plaintiff has not engaged in substantial gainful activity since the alleged onset date (June 26, 2017). (Tr. 14). The ALJ also determined that Plaintiff has severe impairments: depression; anxiety; status post cerebrovascular accident; and posterior capsular opacification of left eye, obscuring vision. (*Id.*). Still, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (Tr. 15). In coming to this conclusion, the ALJ considered Plaintiff's physical impairments under listings 2.02 (Loss of Central Visual Acuity), but found the remaining vision in Plaintiff's better eye after correction is not equal to or less than 20/200. So, under listing 2.03, the ALJ determined that the record failed to demonstrate contraction of the visual field in the better eye with: the widest diameter subtending an angle around the point of fixation no greater than 20 degrees; or an MD of 22 decibels or greater, determined by automated static threshold perimetry that measures the central 30 degrees of the visual field (see 2.00A6d); or a visual field efficiency of 20 percent or less, determined by kinetic perimetry (see 2.00A7c). The ALJ considered the ophthalmology consultative examination that indicated Plaintiff's visual fields were abnormal, but found the results did not demonstrate listing level severity. Moreover, the ALJ noted there was "low test reliability" with the visual field test. (Tr. 16).

Next, the ALJ determined Plaintiff does not meeting Listing 11.04 because she does not have one of the following more than three months post-vascular accident: sensory or motor aphasia resulting in ineffective speech or communication; or significant and persistent disorganization of

motor function in two extremities, resulting in sustained disturbances of gross and dexterous movements, or gait and station. (*Id.*).

> Ultimately, the ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:
>
> [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: restricted from hazards such as heights or machinery, but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles; never required to operate a motor vehicle during the course of a workday; can never use ladders, ropes or scaffolds; occasional near and far acuity and occasional depth perception in left eye; and limited to simple tasks and routine and repetitive tasks.

(Tr. 17).

As for the allegations about the intensity, persistence, and limiting effects of Plaintiff's symptoms, the ALJ found that they were not entirely consistent with the record. (Tr. 18).

Relying on the VE's testimony, the ALJ determined that Plaintiff is unable to perform her past relevant work as a line assembler, office manager, pants presser, sub sorter or counter attendant. (Tr. 22). The ALJ further determined that given her age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform, such as a laundry worker, kitchen helper, and janitor. (Tr. 22–23). The ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since June 26, 2017. (Tr. 23).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health &*

5

*Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

### III.     DISCUSSION

In her Statement of Errors, Plaintiff contends that: (1) the ALJ failed to properly evaluate the opinions provided by the consultative physicians, Drs. Jameson Mattingly, M.D. and Jon Cooperrider, II, O.D.; and (2) the ALJ's decision should be reversed because the ALJ originally issued a decision denying benefits to Plaintiff before the ALJ had been properly appointed. (Docs. 13 and 19). The Commissioner counters that the ALJ carefully reviewed the record, ultimately assessing a reasonable and comprehensive residual functional capacity finding for a restricted range of medium work. (Doc. 14). The Commissioner further responds that Plaintiff's separation of powers argument is meritless. (*Id.*). Upon review, the Undersigned concludes that the ALJ properly evaluated the opinions of Drs. Mattingly and Cooperrider, and the ALJ was properly appointed.

#### A.     Evaluation of Medical Source Opinions

In her first assignment of error, Plaintiff argues that the ALJ improperly evaluated Dr. Mattingly's and Dr. Cooperrider's opinions. (*See* Doc. 13 at 6–11). More specifically, Plaintiff focuses on Drs. Mattingly and Cooperrider opined visual limitations that were more restrictive than those ultimately included in the RFC. Plaintiff says that these limitations should have been adopted. Yet, upon review, the Undersigned finds the ALJ properly evaluated the medical opinion evidence, and substantial evidence supports the RFC.

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id.* Plaintiff filed her application after May 23, 2017, so it is governed by the relatively new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).

The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from the claimant's medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and an ALJ must explain how they were considered. §§ 404.1520c(b)(2); 416.920c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(1). When evaluating consistency, the

7

more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. *Id*.

The role of the ALJ is to articulate how persuasive he or she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). Notably, the role of the Court is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.*, at *14.

Here, the ALJ considered Drs. Mattingly's and Cooperrider's medical opinions, evaluated them based upon their own treatment records and the records as a whole, and found them to be unpersuasive. The ALJ's discussion is thorough enough to allow the Undersigned to determine if the proper factors, supportability and consistency, were considered and conclude that the ALJ's determination is supported by substantial evidence. Thus, as explained below, the ALJ's evaluation of Drs. Mattingly's and Cooperrider's opinions is not erroneous.

    1.    Dr. Mattingly

Dr. Mattingly, an internal medicine consultative examiner, evaluated Plaintiff on August 19, 2018. (Tr. 21, 1635). After this one-time examination, Dr. Mattingly's impression was:

> This is a 39-year-old [Plaintiff] with a history of vision issues. Her vision exam was significant for greater than 2200 bilaterally. Was able to see fine instructions up close quite well. Because of this it is unclear the extent of her vision as far as if she is truly just seeing shapes and shadows or if she is seeing actually in more detail. Contributing factors include this [Plaintiff] should be able to walk two out of eight hours in a day. The patient could probably be on her feet for a combined total of six to eight hours in a day. She could probably carry less than ten pounds frequently and could carry more than ten pounds on occasions. Other limitations and function include anything that requires vision.

8

(Tr. 1637).

> Regarding this opinion, ALJ determined[1]:
>
> In August 2018, Dr. Mattingly, the internal medicine consultative examiner, opined that [Plaintiff] should be able to walk two out of eight hours in a day and be on her feet for a combined total of six to eight hours a day (Tr. 1637). Dr. Mattingly assessed that [Plaintiff] could carry less than ten pounds frequently, more than ten pounds occasionally, and concluded that other limitations included "anything that requires vision" (Tr. 1637).
>
> This opinion is not persuasive. The opinion is not consistent with contemporaneous examination notes, as well as not generally supported by the record as a whole. For example, Dr. Mattingly assessed lifting limitations that are not supported by unremarkable examination findings of normal gait, 5/5 strength in the upper and lower extremities and normal range of motion (Tr. 1636).

(Tr. 21).

As for supportability, the ALJ determined that Dr. Mattingly's opinion was unsupported by his own contemporaneous notes. (*Id.*). Specifically, Dr. Mattingly opined that Plaintiff "should be able to walk two out of eight hours in a day. [Plaintiff] could probably be on her feet for a combined total of six to eight hours in a day. She probably could carry less than ten pounds frequently and could carry more than ten pounds on occasion." (Tr. 1637). These lifting limitations, the ALJ said, "are not supported by unremarkable examination findings of normal gait,

---

[1] The Undersigned notes that the ALJ, when discussing the factors of consistency and supportability, switched the analysis, discussing "supportability" in the context of the consistency analysis and vice versa. *See, e.g,. Mary W. v. Comm'r of Soc. Sec.*, No. 2:20-CV-5523, 2022 WL 202764, at *10 (S.D. Ohio Jan. 24, 2022), *report and recommendation adopted sub nom. Wiseman v. Comm'r of Soc. Sec.*, No. 2:20-CV-5523, 2022 WL 394627 (S.D. Ohio Feb. 9, 2022) (distinguishing supportability which evaluates what the doctor based their opinion on, from consistency which is how the opinion compared to the record as a whole). While the distinction is semantic and does not impact how the Undersigned substantively evaluates the determination, it is noted for clarity. The Undersigned applies the ALJ's reasoning to the proper factor in this Report and Recommendation.

5/5 strength in the upper and lower extremities and normal range of motion." (Tr. 21 (citing Tr. 1636)). He also found the opinion to not be consistent with the record as a whole. (*Id.*).

Plaintiff argues that the ALJ's supportability determination is not supported by substantial evidence because Dr. Mattingly's opinion was based on her limited vision and the ALJ discounted it based on irrelevant physical findings. (Doc. 13 at 8–9). But Plaintiff's read of the opinion is too narrow.

Elsewhere, the ALJ analyzed Dr. Mattingly's impression of Plaintiff's vision impairments. The Undersigned must consider that analysis because the ALJ's opinion ought to be read as a whole. *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (noting that the ALJ's entire decision must be considered); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (affirming ALJ evaluation of opinion where "[e]lsewhere in her decision, the ALJ laid out in detail the treatment records" undercutting the opinion); *Carpenter v. Comm'r of Soc. Sec.*, No. 2:18-CV-1250, 2019 WL 3315155, at *10 (S.D. Ohio July 24, 2019), *report and recommendation adopted*, No. 2:18-CV-1250, 2019 WL 3753823 (S.D. Ohio Aug. 8, 2019) (considering the ALJ's discussion of Plaintiff's depressive disorder at step two when determining if the RFC is supported). The ALJ expressly noted that Dr. Mattingly concluded that "the extent of [Plaintiff's] vision was unclear." (Tr. 19 (citing 1637)). This statement was made by Dr. Mattingly because Plaintiff was able to see fine instructions up close quite well, calling into question whether she could see in more detail than shapes and shadows. (Tr. 1637). So Dr. Mattingly's restrictive opinion that Plaintiff is limited in anything that requires vision is unsupported by his notation that Plaintiff's vision impairment "was unclear"—and the fact that she could see instructions up close.

Plaintiff also argues the ALJ erred because Dr. Mattingly's opined vision limitation is consistent with the record that Plaintiff has ongoing visual issues and a long history of eye problems. (*Id.* at 9–10). In other words, Plaintiff argues that Dr. Mattingly's conclusion about her vision has support.

But the record is mixed. The ALJ extensively considered Plaintiff's record regarding her vision. (Tr. 15–16, 18–20). The ALJ detailed her various eye surgeries due to her retinal detachment. (Tr. 18–19). He noted that her medical records indicate that Plaintiff's vision has fluctuated from 20/400 to 20/200 in the left eye (Tr. 19 (citing Tr. 2534,2542)), and 20/70+1 to 20/40 in the right eye (Tr. 19 (citing Tr. 2575, 2542)). Plaintiff was prescribed glasses with a prism and was able to achieve "single vision based on the prescription combination that was demonstrated to her in the phoropter." (Tr. 19 (citing Tr. 2543)). She also benefited from using eye drops. (Tr. 19 (citing Tr. 2534)). The ALJ also noted that, at times, Plaintiff reported spots, floaters, flashes of light, trouble with depth perception, and double vision. (Tr. 19 (citing Tr. 1718, 1851, 2539–40, 2574)). The ALJ also took note of Plaintiff's hearing testimony in which she said she struggled with "eye pain, double vision, floaters, and blurry vision," her prism stickers make her feel sick, and "she bumps into walls and objects and falls down 'a couple times' during a typical week."

The ALJ summarized his review of the records: "In terms of [Plaintiff's] vision impairments, treatment records establish that the claimant does not have double vision with proper glasses and her vision is improved when she is using prescribed eye drops." (Tr. 20). Finally, the ALJ found other medical opinions to be persuasive because they "assessed postural, environmental and visual limitations [that] are consistent with [Plaintiff's] reports of spots and/or floaters in the left eye, flashes of light, trouble with depth perception and double vision." (Tr. 21 (citing Tr. 1718,

11

1851, 2539–40, 2574)). All told, the ALJ rejected Dr. Mattingly's restrictive opinion as unsupported and inconsistent and found other medical opinions to be a better fit for the record as a whole. Consequently, the ALJ's conclusion has substantial support.

### 2. Dr. Cooperrider

Dr. Cooperrider, an ophthalmology consultative examiner, evaluated Plaintiff on October 3, 2018. (Tr. 21, 1815). He opined that Plaintiff's "legal blindness [] prevents most work activities." (Tr. 1815). Again, the ALJ was unpersuaded. (Tr. 21). The ALJ noted that Dr. Cooperrider "determined that [Plaintiff's] visual fields were abnormal," but indicated that "the visual field testing had '*low test reliability*.'" (Tr. 19 (emphasis added)). So the ALJ found the restrictive opinion unsupported. Given that Dr. Cooperrider himself discounted the value of the visual testing method, it was not error for the ALJ to have doubts too.

Additionally, the ALJ found Dr. Cooperrider's opinion to be inconsistent with the record as a whole. (Tr. 21). To reiterate, the record on Plaintiff's vision is mixed. As the ALJ noted: "[T]reatment records documenting [Plaintiff's] distance visual acuity without correction ranged from 20/40 to 20/70+1 on the right and 20/200 to 20/400 on the left (Tr. 2534, 2542, 2575)[,]" and treatment records that establish she "does not have double vision with proper glasses and her vision is improved [when she uses] prescribed eye drops." (Tr. 21 (citing Tr. 2533, 2543)). Though Plaintiff disagrees with the ALJ's conclusion, it has support. So there was no error.

### B. Separation of Powers

Plaintiff also contends that remand is required because a statute that provided tenure protection to the former Commissioner of Social Security, Andrew Saul, violated the separation of powers doctrine, and therefore, the decision to deny her benefits was made by individuals who lacked a proper delegation of power to make benefits determination. This contention lacks merit.

### 1. Plaintiff's Constitutional Claim is Procedurally Improper

As an initial matter, the claim is procedurally improper. Plaintiff's Complaint does not include any Constitutional claims. (Doc. 4). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, however, that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although a complaint need not provide "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id*. Here, the United States Supreme Court case upon which Plaintiff bases her Constitutional claim was decided on June 20, 2020. Yet Plaintiff gave no notice, let alone fair notice, of her Constitutional claim in her February 8, 2021 Complaint. *See John R. v Comm'r of Soc. Sec.*, Case No. C20-6176-MLP, 2021 WL 5356719, *7 (W.D. Wash. Nov. 16, 2021) (finding that a plaintiff failed to comply with Rule 8 by failing to plead a separation of powers claim in complaint seeking judicial review of Commissioner's decision to deny benefits); *Shannon R. v. Comm'r of Soc. Sec.*, Case No. C21-5173, 2021 WL 5371394, at * 6–7 (Nov. 18, 2021) (same). For that reason, she failed to comply with Rule 8.

### 2. Plaintiff's Constitutional Claim Lacks Merit

But even if Plaintiff's Complaint was rule compliant, her Constitutional claim lacks substantive merit. Removal of the Commissioner is governed by 42 U.S.C. § 902(a)(3) which provides that the Commissioner may only be removed from office "pursuant to a finding by the President of neglect of duty, malfeasance in office." *Id*. The parties agree that two recent United States Supreme Court cases cast doubt on the constitutionality of that provision.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, the Supreme Court held that a provision that allowed the president to remove the Director of the Consumer Financial Protection

13

Bureau ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President. 140 S.Ct. 2183, 2197 (2020). In *Collins v. Yellin*, decided one year later, the Supreme Court held that a provision limiting the President to removing the Director of the Federal Housing Finance Agency ("FHFA") only for cause similarly violated the separation of powers doctrine. 141 S.Ct. 1761, 1783 (2021) (holding that "*Seila Law* is all but dispositive"). Plaintiff asserts that like the Directors of the CFPB and the FHAA, the Commissioner of Social Security is a single officer at the head of an administrative agency, and therefore, §902(a)(3)'s attempt to impose any restraints on the President's power to remove the Commissioner also violates the separation of powers doctrine. (Doc. 13 at 12–13, 19 at 8–9). The Commissioner agrees. (Doc. 14 at 4) (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)).

Plaintiff further asserts that because this removal provision is unconstitutional, any delegations of power by Former Commissioner Saul, including delegations of authority to ALJs or the Appeals Council who determined her benefits claims, were invalid. (Doc. 13 at 13). The Commissioner contends that Plaintiff's argument fails because the ALJ who determined Plaintiff's claim on May 15, 2020, held office on that date, not because of a delegation of authority from Former Commissioner Saul, but because of a ratification of delegated authority in July 2018,[2] by

---

[2] In *Lucia*, the Supreme Court found that the United States Security Exchange Commission (SEC) ALJs were "inferior officers" under the Appointments Clause, U.S. Const. art II, § 2, cl. 2, and therefore, had to be appointed by a President, a court, or the head of an agency instead of lower-level staff. *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 (2018). Although *Lucia* involved ALJs at the SEC, on July 16, 2018, Acting Commissioner Berryhill ratified the appointment of the Social Security Administration's ALJ's and administrative appeals judges who were previously appointed by lower-level staff in response to the ruling in *Lucia*. See SSR 19-1p, 84 Fed Reg. 9582, (2019).

Former Acting Commissioner Nancy Berryhill. (Doc. 14 at 6). And the Commissioner correctly notes that an Acting Commissioner is not subject to § 902(a)(3)'s removal provision, and therefore that provision's constitutionality, or lack thereof, is irrelevant. *See Collins*, 141 S.Ct. at 1781 (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections); *Thomas E. v. Comm'r of Soc. Sec.*, C21-5107-BAT, 2021 WL 5415241, *5 (W.D. Wash. Nov. 19, 2021) (finding no constitutional injury where ALJ's appointment was ratified by Acting Director Berryhill who, as Acting Director, was not subject to the removal provision in § 902(a)(3)); *Alice T. v. Comm'r of Soc. Sec.*, 8:21CV14, 2021 WL 5302141, *18 (D. Neb. Nov. 15, 2021) (same); *Boger v. Kijakazi*, No. 1:20-cv-00331-KDB, 2021 WL 5023141, * 3 n.4 (W.D.N.C Oct. 28, 2021) ("Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who *could* be removed from the office at the President's discretion.") (emphasis in original).

Nevertheless, Plaintiff asserts that the ALJ and the Appeals Council adjudicated her disability application pursuant to a delegation of authority from Former Director Saul. (Doc. 13 at 13). The Court need not resolve this factual dispute but finds instead that even if Former Director Saul appointed the ALJ and Appeals Council judges[3] who determined Plaintiff's benefits

---

[3] The Undersigned does not accept Plaintiff's assertion in her Reply that the Commissioner waived any defense to her separation of power claim with regards to the Appeals Council by failing to address that claim in the Memorandum in Opposition. (Doc. 19 at 10–12). Plaintiff only cursorily mentioned the Appeals Council in her Statement of Errors (Doc. 13 at 12, 13), and again, failed to provide the Commissioner with fair notice of her Constitutional claim in her Complaint (Doc. 4). In any event, the claim lacks merit with regard to the Appeals Council for the same reasons that the claim lacks merit with regard to the ALJ.

claim, the constitutionality of § 902(a)(3) would not warrant remand for several reasons.

First, even if the removal provision in § 902(a)(3) is unconstitutional, it would not have deprived Former Commissioner Saul of the ability to delegate power to others to decide Plaintiff's benefit claim because of the doctrine of severability. As the Supreme Court noted in *Seila Law*, "one section of a statute may be repugnant to the Constitution without rendering the whole act void." 140 S.Ct. 2208 (quoting *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490 (1900)). Indeed, even in the absence of a severability clause, when "confronting a constitutional flaw in a statute, [the Supreme Court tries] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Id*. (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd*., 561 U.S. 477, 508 (2010)). For that reason, in *Seila Law*, the Supreme Court found that the unconstitutional removal provision was severable from the remainder of the CFPB's governing statutes because the CFPB was capable of functioning independently even if the unconstitutional removal provision was stricken. 140 S.Ct. at 2209–10, 2245. Such is the case here. If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional. *Alice A. v. Comm'r of Soc. Sec.*, Case No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding that plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration); *Shaun A. v. Comm'r of Soc. Sec*., Case No. C21-5003-SKV, 2021 WL 5446878, *4 (W.D. Wash. Nov. 22, 2021) (same); *John R. v Comm'r of Soc. Sec*., 2021 WL 5356719, *8 (same).

In addition, even if the removal provision in § 902(a)(3) is unconstitutional, that would not have automatically rendered Former Commissioner Saul's appointment invalid, and thus, it would not have automatically invalidated his actions, including delegating authority to make benefits

16

determinations or ratifying such delegations. In *Collins*, the Supreme Court found the unconstitutional removal provision did not render the FHFA's appointments invalid, and thus did not automatically void the FHAF's actions under the Director. 141 S.Ct. 1787 ("Although the statute unconstitutionally limits the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA [that were challenged on appeal] as void."). Accordingly, infirmities in removal provisions do not automatically void appointments or actions taken by properly appointed officials. *Alice A. v. Comm'r of Soc. Sec.*, 2021 WL 5514434, *6 (finding that '[t]he infirm *removal* provision does not render Commissioner Saul's *appointment* invalid, which in turn does not render the ALJ's disability determination void.") (emphasis in original); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (finding that the unconstitutional "removal provision does not render the Commissioner's appointment invalid, and thus does not automatically void the SSA's actions under the Commissioner").

Instead, to obtain reversal of an agency decision, a plaintiff must show "compensable harm" flowing from an unconstitutional removal clause. *Collins*, 141 S.Ct. 1788–89 (remanding for further proceedings to determine whether compensable harm to Plaintiff occurred due to the President's inability to remove a Director of the FHFA except for cause). Here, Plaintiff makes no such showing. Plaintiff asserts that her injuries flow from an illegitimate delegation of power, that her harm involves "government actors exercising power which they did not lawfully possess," and that therefore, her harm should be presumed. (Doc. 19 at 17). In so doing, Plaintiff appears to conflate issues that might have presumably flowed from the unconstitutional *appointment* of Former Director Saul with a provision allowing for his unconstitutional *removal*. As explained above, however, appointments are not nullified by an unconstitutional removal provision. Nor are

17

actions taken by a properly appointed official.

In short, Plaintiff has not pointed to a connection between any unconstitutional limit on Former Director Saul's removal and the ALJ's determination denying her benefits. *See also Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir 2021) (finding that "there is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground."). Nor is it likely that Plaintiff could do so, given that any particular ALJ or Appeals Council decision would not concern the President. *Cf. Collins*, 141 S.Ct. at 1802 (Kagan, J. concurring) ("The SSA has a single head with for-cause removal protection . . . But . . . I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone . . . . When an agency decision would not capture a President's attention, his removal authority could not make a difference.").

For all these reasons, the Undersigned finds that Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that judgment be entered in favor of Defendant.

### PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting

authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: July 25, 2022          /s/ Kimberly A. Jolson
                             KIMBERLY A. JOLSON
                             UNITED STATES MAGISTRATE JUDGE